## Commonwealth *v.* Padgett, Appellant.

Submitted November 13, 1967.   Before BELL, C. J., MUSMANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Leroy Padgett,* appellant, in propria persona.

*Walter M. Phillips, Jr.* and *Alan J. Davis,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, January 9, 1968:

All of the implications of *Escobedo v. Illinois,* 378 U.S. 478, 84 S. Ct. 1758 (1964) have yet to be determined by the courts.   We are today faced with a problem concerning the relationship *Escobedo* bears to the recently announced United States Supreme Court decision governing constitutional harmless error, *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967), followed by this Court in *Commonwealth v. Pearson,* 427 Pa. 45, 233 A. 2d 552 (1967).

Appellant, Leroy Padgett, after a June 1965 jury trial, was convicted of second degree murder.   Post-trial motions were filed and denied, but no appeal was taken.   Padgett subsequently filed a petition under the Post Conviction Hearing Act alleging only that the trial court erred in allowing the introduction into evidence of a statement obtained in the absence of counsel at a time when representation was constitutionally required. Post-conviction counsel was appointed, an evidentiary hearing held and relief denied.   We affirm.

Although the Commonwealth in its brief admits that a statement was obtained from appellant under circumstances violative of *Escobedo,* it insists that this constitutionally tainted evidence is admissible for the purpose of impeaching credibility[1] if certain specified conditions exist. Support for this proposition can be found in *Commonwealth v. Wright,* 415 Pa. 55, 202 A. 2d 79 (1964), a case discussing the admissibility for purposes of impeachment of evidence obtained in violation of the fourth amendment. The issue thus presented is the extent to which *Escobedo* modifies the *Wright* doctrine.

A careful reading of *Escobedo* in light of the gloss placed upon that decision by *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966) dictates the conclusion that a statement procured either after failure to give an accused opportunity to consult with counsel or, as in this case, failure to warn an accused of his right to remain silent (under *Escobedo*), or in the absence of police attempts to advise the accused of his constitutional rights (under *Miranda*) cannot be employed at trial for any purpose. The *Miranda* opinion states quite clearly and without limitation that the prosecution *"may not use"*[2] statements obtained in violation of

---

[1] Padgett's statement was employed at trial solely for impeachment purposes.

[2] See *Miranda v. Arizona,* supra at 444, 86 S. Ct. at 1612: "Our holding . . . briefly stated is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The absence of any limitation in the *Miranda* holding allowing use of unconstitutionally procured statements for purposes of impeachment is significant, unless we were to assume that the Supreme Court was unaware of its prior cases permitting admission of evidence obtained in an unconstitutional search to impeach the credibility of the defendant. See, e.g., *Walder v. United States,* 347 U.S. 62, 74 S. Ct. 354 (1954). We are unwilling to make such an assumption and thus conclude that *Miranda* impliedly rejects any exception to the blanket prohibition against prosecutorial use of unconstitutionally obtained statements.

*Miranda's* procedural safeguards. The Supreme Court, throughout *Miranda,* stressed that both decisions were crafted from the same constitutional fabric[3] and were designed to effectuate the same purposes;[4] the conclusion is thus inescapable that a statement violative of *Escobedo* may not be used by the prosecution, even for purposes of impeachment. See the excellent analysis of this issue contained in Judge HOFFMAN'S opinion in *Commonwealth v. Burkett,* 211 Pa. Superior Ct. 299, 305, 235 A. 2d 161, 163 (1967) (concurring opinion); see also *Miranda v. Arizona,* supra at 477, 479, 86 S. Ct. at 1629, 1630. However, we here portend no modification of either *Wright* or *Walder v. United States,* supra n.2, to the extent that they hold that evidence seized in violation of the Fourth Amendment is admissible to impeach credibility for the considerations governing fourth amendment claims may well differ from those forming the basis of *Miranda.*

The Commonwealth next contends that utilization of the statement, if error, was harmless.[5] Since we are undoubtedly confronted with an error of constitutional proportions, the question thus presented is whether evidentiary use of Padgett's statement can be tested by the harmless error standard, see *Chapman v. California,* supra, or whether Padgett's conviction *must* be reversed without any inquiry as to the impact of the error under the doctrine of automatic reversal.[6] "There are

---

[3] See *Miranda v. Arizona,* supra at 442, 86 S. Ct. at 1611.

[4] Id. at 465, 86 S. Ct. at 1623: "There [in *Escobedo*], as in the cases today, we sought a protective device to dispel the compelling atmosphere of the interrogation."

[5] Apparently the Commonwealth has advanced this contention in at least one other case. See *Commonwealth v. Coyle,* 427 Pa. 72, 76-77 n.3, 233 A. 2d 542, 544-45 n.3 (1967). Our finding in *Coyle* that the statement was voluntary rendered unnecessary any resolution of this contention.

[6] See, e.g., *Haynes v. Washington,* 373 U.S. 503, 518-19, 83 S. Ct. 1336, 1345-46 (1963).

places in the law through which a pair of mutually oblivious doctrines run in infinitely parallel contrariety, like a pair of poolhall scoring racks on one or the other of which, seemingly at random, cases get hung up."[7] This observation could easily be applied to the harmless error-automatic reversal dichotomy only partially resolved by *Chapman*. Although *Chapman* did recognize the existence of the automatic reversal cases, it made no attempt to articulate the rationale separating those constitutional errors requiring automatic reversal from those to which the harmless error doctrine can be applied other than to classify the automatic reversal cases as involving "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error."[8]

Apparently the United States Supreme Court was content in *Chapman* to permit state and lower federal courts to fill the interstices between errors affecting rights basic to a fair trial and those which can be tested by the rubric of harmless error.[9] Fortunately, how-

---

[7] Amsterdam, "The Void-For-Vagueness Doctrine in the Supreme Court," 109 U. Pa. L. Rev. 67 (1960).

[8] See *Chapman v. California*, supra at 23, 87 S. Ct. at 827-28. Without indicating that its list was exhaustive, the Court gave three examples of automatic reversal situations—admission of a coerced confession, denial of counsel at trial and trial before a partial judge. Id. at 23 n.8, 87 S. Ct. at 828 n.8.

[9] Our single post-*Chapman* decision applied the harmless error rule to a fourth amendment violation, see *Commonwealth v. Pearson*, supra, a decision in accord with the result reached by the Sixth Circuit Court of Appeals in *United States v. Ramseur*, 378 F. 2d 902 (6th Cir. 1967). Other courts have applied *Chapman* to claims involving an alleged conflict of interest of trial counsel, see *Ford v. United States*, 379 F. 2d 123 (D.C. Cir. 1967) and *Vanater v. Boles*, 377 F. 2d 898 (4th Cir. 1967) and to a claim involving admission of an unconstitutionally procured prior conviction for purposes of damaging defendant's credibility, see *People v. Coffey*, 67 Cal. 2d 204, 430 P. 2d 15, 60 Cal. Rptr. 457 (1967). The California Supreme Court, a situs of considerable post-*Chapman*

ever, later decisions strongly indicate that the United States Supreme Court has taken a position on the proper classifications of *Escobedo* and *Miranda,* and would hold that an *Esobedo* or *Miranda* error can be harmless.   In *United States v. Wade,* 388 U.S. 218, 87 S. Ct. 1926 (1967), drawing upon the premises of *Escobedo* and *Miranda,* it was held that a post-indictment lineup was a critical stage of the prosecution entitling the prisoner to the aid of counsel.[10]   Significantly, the *Wade* record was remanded to the district court to determine, inter alia, whether the introduction at trial of identification evidence based upon the constitutionally infirm lineup could be excused under *Chapman.* See 388 U.S. at 242, 87 S. Ct. at 1940.   *Wade's* dependence upon *Escobedo* and *Miranda* is thus indicative that the harmless error rule can be applied to *Escobedo* and *Miranda* violations.

This observation is confirmed by *Stovall v. Denno,* 388 U.S. 293, 87 S. Ct. 1967 (1967), the decision determining the retroactivity-prospectivity of *Wade.*   The Supreme Court in *Stovall* stated that for purposes of

---

litigation, has in at least three cases applied the harmless error rule to *Escobedo* and *Miranda* claims, although in each case the error was found not harmless and thus these decisions did not have to face squarely the implications of the automatic reversal doctrine.   See *People v. Jackson,* 67 Cal. 2d 96, 429 P. 2d 600, 60 Cal. Rptr. 248 (1967) (*Escobedo* claim) ; *People v. Doherty,* 67 Cal. 2d 9, 429 P. 2d 177, 59 Cal. Rptr. 857 (1967) (*Miranda* claim) ; *People v. Powell,* 67 Cal. 2d 32, 429 P. 2d 137, 59 Cal. Rptr. 817 (1967) (*Escobedo* claim).

[10] *United States v. Wade,* supra at 227, 87 S. Ct. at 1932: "The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution."   Compare *Escobedo v. Illinois,* supra at 492, 84 S. Ct. at 1766: "We hold only that when the process shifts from investigatory to accusatory . . . our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

retroactivity it has erected a hierarchy of constitutional rights based upon whether " 'a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial . . . .' " See id. at 298, 87 S. Ct. at 1970, quoting from *Johnson v. New Jersey*, 384 U.S. 719, 728-29, 86 S. Ct. 1772, 1778 (1966). Characterizing the impact upon the reliability of the fact-finding process necessary to require retroactive application of a newly created constitutional mandate as "one of degree," the Court in *Stovall* found that the reliability impact of *Wade* was similar to that of *Escobedo* and *Miranda* and thus refused to apply *Wade* retroactively.

We are therefore confronted with a decision indicating that the *Chapman* doctrine can be applied to lineup cases (*Wade*) and another decision holding that for purposes of retroactivity *Wade* presents considerations markedly similar to those of *Escobedo* and *Miranda* (*Stovall*). Recognizing that the considerations evaluated in determining whether retroactive application is warranted are not in all respects identical to those involved in classifying a right as "so basic to a fair trial that . . . [its] infraction can never be treated as harmless error," it remains clear that one of the primary bases for both decisions is the degree of impact that the right involved has upon the fact-finding process. For example, the right to trial counsel under *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963), a right having perhaps the greatest impact upon fact-finding reliability, has been given both retroactive application and is one of those rights whose violation results in automatic reversal of a conviction. Similarly, changes governing the voluntariness of confessions are retroactive and admission of a coerced confession requires automatic reversal. When contrasted with the inherent unreliability of a conviction procured in the absence of counsel or on the basis of a coerced

confession, a conviction obtained through use of an *Escobedo* or *Miranda* violation does not go to the very roots of fact-finding reliability, for such a statement may well be voluntary. Given the similarity of the principles governing retroactivity and those governing automatic reversal, the Supreme Court's decision that neither *Escobedo* nor *Miranda* are retroactive and its decision that a *Wade* violation does not require automatic reversal, we conclude that the United States Supreme Court would hold that *Escobedo* and *Miranda* violations are also subject to the *Chapman* rule, a conclusion we hereby follow.

All that remains is to determine whether use of Padgett's statement was harmless. On four separate occasions mention was made at trial of the statement. To place these references in context, a brief discussion of appellant's case is necessary. Other than several character witnesses testifying as to Padgett's good reputation and as to the decedent's reputation for violence, the defense consisted of appellant's version of the shooting here involved. Padgett, a bartender, was working the night shift; as he was cleaning the counter, Donald Howard (the decedent) accused Padgett of taking his drink. Padgett denied this accusation and began to wash some glasses in a tub behind the bar. According to appellant, Howard then leaned over the bar and struck him in the mouth. Intending to eject Howard from the bar, Padgett then took a gun concealed in a cigar box under the bar and, holding the gun in his right hand, walked from behind the bar and confronted Howard. As Padgett reached for Howard with his left hand in an attempt to spin Howard in the direction of the exit, Padgett fired one shot into the side of the bar allegedly to frighten Howard. Howard immediately thereafter "moved in on" Padgett and, as Padgett subsequently testified, his gun accidentally discharged the fatal shot.

On four occasions during Padgett's cross-examination the Commonwealth quoted from Padgett's statement; two can be classified as involving contradictions, one as an omission and one as consistent. The two contradictions comprise the following: Padgett testified at trial that Howard was standing at the bar when he accused Padgett of taking his drink while in the statement Padgett placed Howard as seated at the bar; at trial Padgett insisted that he was not certain as to the length of his acquaintance with Howard (but that it was more than one year) although in his statement he related that he knew Howard for about one year. Padgett testified that he told Howard that he had not served him a drink, but the statement, as pointed out by the prosecution, omitted any reference to this remark. Finally, Padgett testified that, at the instant the fatal shot was fired, Howard was "moving in" as if he was going to strike Padgett, while in the statement, as read to the jury, Padgett said "it was just as if he was going to leap on you."

Cognizant of the fact that under the stringent *Chapman* standard we can classify the use of Padgett's statement as harmless error only if we are convinced that the error "was harmless beyond a reasonable doubt," we nevertheless believe that this error was harmless.[11] The above four references constitute the only mention

---

[11] Several of our pre-*Chapman* decisions involve a problem similar to the one here presented. See *Commonwealth ex rel. Edowski v. Maroney*, 423 Pa. 229, 223 A. 2d 749 (1966) ; *Commonwealth ex rel. Adderley v. Myers*, 418 Pa. 366, 211 A. 2d 481 (1965). Although not holding, there are statements in both cases that where the defendant's version at trial of the events of the crime is identical with that contained in his pre-trial statement, admission of the statement is harmless error. Neither case employs the *Chapman* standard but their results would appear to be consistent with the *Chapman* language.

made of the statement.[12]  Assuming that the jury chose to believe Padgett's statement and reject any part of his trial testimony inconsistent therewith, we can find nothing in that statement which in any way derogates from Padgett's version of the incident.  Furthermore, the statement played an insignificant role in the trial. Not only was there no mention in the trial judge's charge of the statement, a fact which was crucial in both *Chapman* and *Pearson,* but the charge as to credibility of witnesses omitted the often included paragraph based upon the latin maxim *"falsus in uno, falsus in omnibus"* (false in one thing, false in everything).[13] *Under these circumstances,* the minimal prosecutorial use of Padgett's statement "was harmless beyond a reasonable doubt" and the order below denying post-conviction relief was therefore correct.

Order affirmed.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

[12] Appellant strenuously insists that the statement in fact played a considerably greater role since the jury had possession of it during its deliberations. The statement, never read in its entirety to the jury, was at one point marked for identification by the Commonwealth and a motion was made and granted for its admission. The record, however, gives no indication that this exhibit was taken into the jury room. At the post-conviction hearing, Detective John McGill testified that when he obtained the statement three copies were made. Two copies were at the time of hearing in his possession and he *assumed* that the third was given to the district attorney and then to the jury. It is not an invarient practice for the jury to be given all exhibits. Nor did post-conviction counsel question either trial counsel or the prosecuting district attorney as to whether the jury did in fact have the statement. Under these circumstances, appellant did not prove that the jurors had a copy of his statement while they deliberated.

[13] We do not wish it thought that such a charge was required for such a charge would have been error. See *Western Show Company v. Mix,* 315 Pa. 139, 173 Atl. 183 (1934) ; *Commonwealth v. Parente,* 184 Pa. Superior Ct. 125, 133 A. 2d 561 (1957).